Order Entered.

Patrick M. Flatley
United States Bankruptcy Judge
Dated: Wednesday, June 06, 2007 3:23:39 PM

# UNITED STATES BANKRUPTCY COURT
# FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| TAMMY S. WILSON, | ) | BK. NO. 05-06636 |
| | ) | |
| Debtor. | ) | CHAPTER 7 |
| | ) | |
| CRAIG C. WILSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | AP. NO. 06-00005 |
| | ) | |
| TAMMY S. WILSON, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| GALE E. CARROLL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | AP. NO. 06-00034 |
| | ) | |
| TAMMY S. WILSON, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

Craig C. Wilson ("Mr. Wilson"), filed a motion for summary judgment on his complaint to except a $75,000 debt from the Chapter 7 discharge of Tammy S. Wilson (the "Debtor") pursuant to 11 U.S.C.

1

§ 523(a)(2), (6), or (15) on the grounds that the Debtor is collaterally estopped from disputing a previous state court determination of the Debtor's willful, malicious, and fraudulent conduct, which caused Wilson to incur $75,000 in attorney fees during the litigation over child custody. On similar grounds, Gale E. Carroll ("Carroll") also seeks summary judgment on her complaint to except from discharge her claim against the Debtor in the amount of $9,181.25 for *guardian ad litem* fees charged to the Debtor in the above-mentioned child custody litigation. The Debtor filed a cross-motion for summary judgment on the grounds that her conduct does not rise to the level required to sustain an exception to discharge cause of action.

The parties each submitted briefs in support of their motions and the court took the matter under advisement.[1] For the reasons stated herein, the court will grant the motions for summary judgment of both Wilson and Carroll, and will deny the Debtor's motion for summary judgment.

## I. STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate if, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Fed. R. Bankr. P. 7056. The moving party bears the burden of proof in establishing that there is no genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986). Procedurally, a party seeking summary judgment must make a prima facie case by showing: 1) the apparent absence of any genuine dispute of material fact; and 2) movant's entitlement to judgment as a matter of law on the basis of undisputed facts. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The moving party has the initial burden of establishing that there is an absence of any genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 323; *Anderson*, 477 U.S. at 248. Once the moving party has satisfied this burden of proof, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *Celotex Corp.,* 477 U.S. at 325. The court is required to view the facts and draw reasonable inferences in the light most favorable to the nonmoving party. *Shaw*

---

[1] Because the factual and legal issues presented in these two adversary proceedings are similar, the court will address the cases in the one memorandum opinion.

2

*v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994). However, the existence of a factual dispute is material - thereby precluding summary judgment - only if the disputed fact is determinative of the outcome under applicable law. *Id.; accord In re Crystal Apparel, Inc.*, 220 B.R. 816, 828 (Bankr. S.D.N.Y. 1998) ("A fact is material only if it affects the results of the proceeding and a fact is in dispute only when the opposing party submits evidence such that a trial would be required to resolve the difference"). A genuine issue of material fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248 (1986). The court's role is not "to weigh the evidence and determine the truth of the matter [but to] determine whether there is a need for a trial." *Anderson,* 477 U.S. at 249-50. If no genuine issue of material fact exists, the court has a duty to prevent claims and defenses not supported in fact from proceeding to trial. *Celotex Corp.*, 477 U.S. at 317, 323-24.

## II. BACKGROUND

The Debtor and Wilson had one child, Ciara Nicole Wilson ("Ciara"), on July 17, 1990 and were married in September of 1990. The parties were divorced on August 19, 1992 in the Circuit Court of Randolph County, West Virginia. As a result of the divorce decree, the State court awarded joint custody of Ciara. In 1996, the Debtor accused Wilson of sexually abusing Ciara and sought to have his parental rights terminated. The accusation resulted in the Circuit Court's order of September 26, 1996, terminating Wilson's parental rights until he was able to prove that he had not molested Ciara. In compliance with the September 26, 1996 order and believing that his daughter no longer wished to have a relationship with him, Wilson had no contact with Ciara until June of 2004, at which time, Wilson learned from Ciara's friend that she desired to re-establish a familial relationship with him.

On August 19, 2004, Wilson filed a "Petition to Modify Custodial Allegation Responsibilities" with the Circuit Court alleging that the Debtor's custody of Ciara should be terminated due to her false allegations of sexual abuse and her recent criminal conviction for driving under the influence of alcohol. Special Family Court Judge Roy David Arrington ("Judge Arrington"), who was appointed by the West Virginia Supreme Court of Appeals to hear the case in lieu of Jamie Goodwin Wilfong, Family Court Judge of Randolph County, West Virginia, conducted extensive hearings on the matter. During the course of the hearings, Carroll was appointed to serve as Ciara's *guardian ad litem*. Judge Arrington ultimately

3

awarded custody of Ciara to Wilson on August 18, 2005, after finding no evidence of sexual abuse. Judge Arrington set forth his findings in three extensive orders, which are attached as exhibits to the motions for summary judgment of Wilson and Carroll.[2] The Debtor filed for Chapter 7 bankruptcy relief on October 14, 2005.

### III.  DISCUSSION

Wilson and Carroll both assert that Judge Arrington's rulings show that the Debtor acted with willful and malicious intent to interfere with Wilson's visitation rights when she falsely accused him of sexually abusing Ciara. Wilson and Carroll further assert that each of the obligations owed to them arose out of this willful and malicious conduct. The Debtor, however, contends that the hearings before Judge Arrington were only to litigate whether or not Wilson had sexually abused Ciara such that Judge Arrington's findings relating to willful and malicious intent were beyond the scope of the litigation. Therefore, the Debtor asserts, those findings cannot be used to collaterally estop her from litigating the underlying facts in these discharge proceedings.

**A.  Collateral Estoppel Principles**

Wilson and Carroll each argue that they are entitled to summary judgment as the pertinent factual issues presented in the case were previously determined in State court. As a consequence, they assert that the Debtor is collaterally estopped from attempting to relitigate those factual determinations here.

Collateral estoppel, also known as "issue preclusion," prevents the relitigation of an issue previously decided when the party against whom the doctrine is asserted had a "full and fair opportunity to litigate that issue in the earlier case." *Allen v. McCurry*, 449 U.S. 90, 94-95 (1980). The doctrine of collateral estoppel treats as final only those issues "actually and necessarily

---

[2] The parties submitted three orders from the child custody proceedings. The first order was dated August 10, 2005, the second is dated August 18, 2005, and the third is dated November 29, 2005. The court will only consider two of the three orders submitted by the parties because the third order, in which Judge Arrington states his finding that the Debtor acted willfully, maliciously, and fraudulently, was entered after the Debtor's bankruptcy filing and without obtaining relief from the stay on November 29, 2005. Because the third order is not necessary for disposition of the summary judgment motions, the court will not address whether entry of the order violated the automatic stay or whether such violation would render the order void or merely voidable.

4

determined" in the prior action. *Montana v. United States*, 440 U.S. 147, 153, 99 S. Ct. 970, 59 L. Ed. 2d 210 (1979). Collateral estoppel serves to protect parties from the cost of multiple lawsuits; to prevent inconsistent decisions; to encourage reliance on adjudication by minimizing the possibility of inconsistent decisions; and to conserve judicial resources. *Allen*, 449 U.S. at 94 (1980). It, therefore, promotes judicial economy by preventing needless litigation. *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326 (1979).

The Supreme Court has recognized the application of collateral estoppel principles in the context of § 523(a) discharge actions. *Grogan v. Garner*, 498 U.S. 279, 284 (1991); *See also, Duncan v. Duncan (In re Duncan),* 448 F.3d 725, 728 (4th Cir. 2006); *In re Fousher*, 283 B.R. 278, 284 (Bankr. N.D. Iowa 2002). In that regard, state judicial proceedings are entitled to the same full faith and credit in federal courts as they enjoy in the courts of the state in which they are rendered. 28 U.S.C. § 1738. In determining the preclusive effect of a state court judgment, a federal court must examine the law of the state in which it was entered and give the order or judgment the same preclusive effect that it would have in the forum state. *Duncan*, 448 F.3d at 728. Nevertheless, while state law determines whether a state judgment is to be given preclusive effect in a dischargeability action, the bankruptcy court decides whether the debt is actually dischargeable for bankruptcy purposes. *Bennett v. Smith (In re Smith)* No. 05-2079, 2006 Bankr. LEXIS 3196, *25 (M.D.N.C. November 16, 2006).

In determining whether or not the application of collateral estoppel is appropriate, the court must apply the forum state's law of collateral estoppel. *Duncan,* 448 F.3d at 728; *Hagan v. McNallen*, 62 F.3d 619, 624 (4th Cir. 1995). Under West Virginia law, like the federal standard, collateral estoppel is designed to prevent the relitigation of issues in a subsequent suit that have been litigated in a previous suit, even though the causes of action presented in the two suits differ. *Holloman v. Nationwide Mutual Insurance Co.*, 617 S.E.2d 816 (2005)*; Stillwell v. City of Wheeling*, 558 S.E.2d 598, 604-05 (W. Va. 2001). West Virginia law dictates that collateral estoppel applies only when the following four criteria are met: (1) the issue previously decided is identical to the one presented in the current action; (2) there has been a final adjudication on the merits in the prior proceeding; (3) the party against whom the doctrine is invoked was a party or in privity with a party to the prior proceeding; and (4) the party against whom the

5

doctrine is invoked had a full and fair opportunity to litigate the issue in the prior proceeding. *Holloman*, 617 S.E.2d at 816.

In order for collateral estoppel to apply, as Wilson and Carroll assert, this court must find that the issues of willfulness and maliciousness were actually litigated and necessarily determined by the judgment rendered in State court. 11 U.S.C. § 523(a)(6). If that be the case, then the doctrine of collateral estoppel precludes this court from relitigating those issues in the context of this adversary proceeding. All that would remain for determination is whether those findings, in turn, preclude a discharge of the debts asserted by Wilson and Carroll. Thus, a close examination of the issues before the State court and its findings are in order.

**B. The State Court Findings**

In his rulings, Judge Arrington made numerous factual determinations in the child custody litigation that are relevant to this court's consideration regarding the respective discharge actions brought by Wilson and Carroll pursuant to § 523(a)(6). For purposes of this opinion, the relevant findings were expressed in Judge Arrington's orders entered on August 10, 2005, and August 18, 2005, which were, in turn, based upon proceedings over which he presided occurring on September 30, 2004, March 30, 2005, June 24, 2005, and August 18, 2005.[3] These proceedings included sworn testimony by Wilson and the Debtor, among others. Of note, is that, in accordance with his 1996 order, Judge Arrington placed the burden of proof on Wilson to show that he did not sexually abuse Ciara by clear and convincing evidence.[4] Judge Arrington's findings in the August 10, 2005 and August 18, 2005 orders present the following findings:

1. That the Debtor and Wilson were divorced in the Circuit Court of Randolph County, West Virginia, in 1992. (Pl.'s Mot. Summ. J. Ex. B ¶ 1.)

2. That regular visitation between Ciara and Wilson continued from the time of the parties' divorce in 1992 until approximately January of 1996. (Pl.'s Mot. Summ. J. Ex. B ¶ 2.)

---

[3] Each of the orders were submitted by Wilson as exhibits to his motion for summary judgment. The August 10, 2005 order is designated as Exhibit B, and the August 18, 2005 order is designated as Exhibit C.

[4] Notably, in the present action under §532(a)(6), Wilson and Carroll only have to prove by a preponderance of the evidence that the Debtor acted willfully and maliciously.

6

3. That on April 3, 1996, Wilson's new wife ("Traci") learned that she was expecting a child. That evening, the Debtor left a message on Wilson's answering machine to the effect that since Wilson was going to have a child of his own, he did not need hers.[5] (Pl.'s Mot. Summ. J. Ex. B ¶ 2.)

4. That the following day - April 4, 1996 - the Debtor accused Wilson of sexually abusing Ciara. (Pl.'s Mot. Summ. J. Ex. B ¶ 2.)

5. That a hearing before the Family Law Master in Randolph County was held as a result of the Debtor's allegations. (Pl.'s Mot. Summ. J. Ex. B ¶ 3.)

6. That Wilson was ordered to have no contact with Ciara until he could prove that he did not sexually abuse her. (Pl.'s Mot. Summ. J. Ex. B ¶ 3.)

7. That Ciara, who was five years old at the time, was sent to Larry McNeely, a counselor, to be interviewed. He conducted two interviews. (Pl.'s Mot. Summ. J. Ex. B ¶¶ 2, 4.)

8. That the interviews conducted by McNeely, which were conducted in an unorthodox fashion, including questionable participation by the Debtor (wherein the Debtor "baggered" Ciara to make damaging statements against Wilson), showed nothing that substantiated any sexual abuse by Wilson. (Pl.'s Mot. Summ. J. Ex. B ¶¶ 4, 15 [sic16].)

9. That the delay by Wilson in seeking a resumption of his visitation was adequately explained by him and did not constitute an abandonment of his custody interests. Moreover, he never ceased to honor his support obligations during the nearly eight year interregnum regarding visitation. (Pl.'s Mot. Summ. J. Ex. B ¶ 6.)

10. That Wilson was examined by an expert who testified before Judge Arrington on March 30, 2005. Based on the expert's testimony and the lack of any evidence to the contrary, the Judge concluded that Wilson represents no danger to Ciara. (Pl.'s Mot. Summ. J. Ex. B ¶ 5.)

11. That the testimony of Ciara on September 30, 2005, and August 3, 2005, was deemed untruthful in several respects because she was "merely repeating what Ms. Wilson [the Debtor] ...told her to say." (Pl.'s Mot. Summ. J. Ex. B ¶ 8.)

12. That following the hearing of March 30, 2005, the Debtor was designated as the supervisor

---

[5] Traci's doctor is a good friend and co-worker of the Debtor.

to be present at visits between Wilson and Ciara but was later removed from that role due to her conduct during two visits. (Pl.'s Mot. Summ. J. Ex. B ¶ 10.)

13. That at later visitations, Ciara failed to participate because she was, "following the directions of Ms. Wilson [the Debtor] to sabotage the visitations." Moreover, at these visitations, Ciara presented Wilson with two notes in which she stated that she hated Wilson and wanted him to leave her alone. The notes were found to have been written by her at the Debtor's direction. These findings prompted Judge Arrington to find that the Debtor was in, "willful and contumacious contempt of the visitation orders of the Court." (Pl.'s Mot. Summ. J. Ex. B ¶¶ 10, 17.)

14. That the Debtor accused Wilson of sexually abusing Ciara in 1996 when she was five years old and that this allegation was used as justification to deprive Wilson of all contact with his daughter. (Pl.'s Mot. Summ. J. Ex. B ¶ 12.)

15. That Wilson, on the basis of "clear and convincing evidence," did not sexually abuse Ciara. (Pl.'s Mot. Summ. J. Ex. B ¶ 12.) Findings in that regard were set forth in thirteen separate subparagraphs of which the following are the more salient:

    a. that the Debtor made a previous false allegation of sexual abuse regarding Ciara by her day care providers; (Pl.'s Mot. Summ. J. Ex. B ¶ 12(c).)

    b. that in 1996 when the interviews of Ciara by Larry McNeely, "did not produce the desired results," the Debtor, "pressured Ciara into changing her story and took her to another interviewer at the Summit Center," (that interviewer, Ms. Tordella, ultimately concluded that Wilson did not abuse Ciara); (Pl.'s Mot. Summ. J. Ex. B ¶ 12(j).)

    c. that the Debtor "used the threat of criminal charges in 1996 to get Mr. Wilson [Wilson] to cease his pursuit of visitation; (Pl.'s Mot. Summ. J. Ex. B ¶ 12(l).) and

    d. that each year on March 13, the Debtor has a party to celebrate the day she, "finally coerced Ciara to make a statement against Mr. Wilson [Wilson] . . . The only purpose for this party is for Ms. Wilson [the Debtor] to reinforce hatred in Ciara against Mr. Wilson [Wilson]." (Pl.'s Mot. Summ. J. Ex. B ¶ 12(m).)

16. That, "Ms. Wilson [the Debtor] has made every attempt to keep Ciara away from Mr. Wilson

8

[Wilson], and she continues to use every means to continue her past practices including the renewal of criminal charges." Moreover, "Nothing can be clearer than Ms. Wilson's [the Debtor] intentions to deny visitation between Ciara and Mr. Wilson [Wilson] by using any and all means that she can." (Pl.'s Mot. Summ. J. Ex. B ¶ 17.)

17. That by order of August 10, 2005, Wilson's petition for contempt against the Debtor for denial of visitation rights was granted. Furthermore, the Debtor was assessed a civil fine of $100.00 for her "interference with Mr. Wilson's [Wilson] visitation" rights and given two weeks (as measured from August 3, 2005) within which to purge the contempt. (Pl.'s Mot. Summ. J. Ex. B Decretal ¶ 5.)

18. That on August 18, 2005, the Debtor failed to purge herself of contempt of the Family Court order in facilitating visitation and thus was ordered to be incarcerated. Furthermore, her release was condition upon, among other things, the posting of a performance bond to cover the costs regarding the *guardian ad litem* fees and the attorney fees of Wilson. (Pl.'s Mot. Summ. J. Ex. C Decretal ¶ 1.)

19. That the Debtor was ordered to, "pay all of Mr. Wilson's [Wilson] attorney fees, except the $2,500 retainer paid by Mr. Wilson to Jeff Triplett in August of 2004, all *guardian ad litem* fees, all supervisor fees and all other court costs." Futhermore, it was ordered that, "Ms. Wilson [the Debtor] will reimburse Mr. Wilson [Wilson] for all fees and costs already paid by him. If Ms. Wilson [the Debtor] had not filed undeserved sexual abuse charges against Mr. Wilson [Wilson], and if she had complied with the many visitations orders of the Court, these expenses would not have been incurred." (Pl.'s Mot. Summ. J. Ex. C Decretal ¶ 3.)

## C. Application of Collateral Estoppel to the §523(a)(6) Actions

In these consolidated cases, Wilson and Carroll have successfully demonstrated the four requirements for collateral estoppel. First, the above-cited factual issues that were previously decided in State court are identical to the factual issues that are relevant to resolution of the case sub judice. Notably, in State court, Wilson proved by clear and convincing evidence that he did not sexually molest Ciara. Second, there was a final adjudication on the merits in the child custody action. In fact, the Debtor unsuccessfully appealed Judge Arrington's order. Third, the Debtor was a party to the child custody litigation. Finally, the Debtor was represented by counsel and actively litigated these issues by presenting

9

testimony and other evidence. Therefore, she had a full and fair opportunity to litigate each of the factual issues in the prior proceeding. Because Wilson and Carroll have successfully demonstrated compliance with the four requirements for collateral estoppel, the factual determinations made by Judge Arrington are deemed to be the established facts in these consolidated adversary proceedings.

Wilson asserts that the facts, as set forth above, clearly demonstrate that the Debtor acted willfully and maliciously in interfering with Wilson's right to visitation with Ciara. In response, the Debtor suggests that her willful and malicious conduct was not at issue in the child custody proceeding, and thus, the court cannot prevent her from litigating those issues in the present proceeding.

Section 523(a)(6) provides:

> (a) A discharge under section 727, 1141,1228(a)(1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt –
> 
> (6) for willful and malicious injury by the debtor to another entity or to the property of another entity.

11 U.S.C. § 523(a)(6).

The term "entity" is defined in 11 U.S.C. § 101(15) as including a "[p]erson, estate, trust, governmental unit, and United States trustee." Wilson and Carroll are thus entities within the meaning of § 523(a)(6). The operative elements of § 523(a)(6) regarding "willful" and "malicious" injury are stated in the conjunctive. Therefore, both elements must be established before a finding of nondischargeability can be made under § 523(a)(6). The moving party bears the burden of proof by a preponderance of the evidence. *Grogan*, 498 U.S. at 288. Section 523(a)(6) only applies to acts done with the actual intent to cause injury: mere negligence, gross negligence, and recklessness will not suffice. *Kawaauhau v. Geiger*, 523 U.S. 57, 61-64 (1998) ("[N]ondischargeability takes a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury."); *Duncan*, 448 F.3d at 729 (same). Because a debtor is unlikely to admit to an intention to cause injury, courts have permitted a debtor's state of mind to be established through circumstantial evidence. *KMK Factoring, L.L.C. v. McKnew (In re McKnew)*, 270 B.R. 593, 640 (Bankr. E.D. Va. 2001); *Call Federal Credit Union v. Sweeney (In re Sweeney)*, 264 B.R. 866, 872 (Bankr. W.D. Ky. 2001) (citing *Harr v. Harr (In re Harr)*, No. 98-1182, 2000 Bankr. LEXIS 401 at *6 (Bankr. S.D. Ohio March 24, 2000). "Willful" means conduct that is either

"deliberate or intentional." *First National Bank v. Stanley (In re Stanley)*, 66 F.3d 664, 667 (4th Cir. 1995). In establishing "malice," neither ill will toward a creditor, nor a specific intent to injure are necessary; rather, when a debtor's injurious act is done "in knowing disregard of the rights of another," the conduct is malicious. *Id*. Malice may be implied and proven by the acts or conduct of the debtor in the context of the surrounding circumstances. *In re McNallen*, 62 F.3d 619, 625-26 (4th Cir. 1995); *St. Paul Fire & Marine Ins. Co. v. Vaughn*, 779 F.2d 1003, 1010 (4th Cir. 1985). Therefore, in order to prevail on a § 523(a)(6) cause of action excepting a debt from discharge, the movant must demonstrate that: 1) the debtor caused an injury to an entity or property of that entity; 2) the debtor intended to cause that harm; 3) the intentional act was done maliciously; and 4) that the debt sought to be excepted from discharge arose out of such conduct.

### 1. Wilson's Claim for Attorney Fees

Wilson argues that the orders arising out of the State court litigation over the custody of Ciara conclusively decided the issue of whether or not the Debtor's conduct was willful and malicious in accusing Wilson of sexually abusing Ciara and interfering with his visitation with her.[6]

First, Wilson must demonstrate that he was injured as a result of the Debtor's conduct. Wilson has a constitutionally protected right to have a relationship with Ciara. *Troxville v. Granville*, 530 U.S. 57, 66-67 (2000); *Davis v. Hamanaka (In re Hamanaka)*, 53 B.R. 320, 323 (Bankr. S.D.N.Y. 1985). He, however, was denied visitation with Ciara for approximately eight years as a result of undeserved sexual abuse charges. He was further denied visitation by the Debtor's conduct once he brought the action to modify the custodial order. Therefore, the Debtor harmed Wilson by interfering with this right. *See Hamanaka,* 53 B.R. at 323 (holding that while a parent's right to visitation is not a property right, interference with the right constitutes harm to the parent under § 523(a)(6)).

Second, Wilson must establish that the Debtor intended to cause the harm – not merely that the Debtor's actions resulted in the harm. As found by Judge Arrington in his August 10, 2005 order, and as

---

[6] The specific finding of willful and malicious conduct was stated in the November 29, 2005 order, which may have been entered in violation of the automatic stay. Because it is not essential for disposition, the court will not consider the order.

11

adopted by this court, "Nothing can be clearer than Ms. Wilson's [the Debtor] intentions to deny visitation between Ciara and Mr. Wilson [Wilson] by using any and all means that she can." Manifestly, the Debtor acted with the requisite intent.

Third, regarding the Debtor's malicious conduct, Judge Arrington's orders evidence a pattern of manipulation by the Debtor, spanning nearly ten years, that was intended to prevent Wilson from having visitation with Ciara. The manipulation began in 1996 when the Debtor made her first false accusation of child sexual abuse against Wilson upon learning that Traci, his new wife, was expecting a child. As determined by Judge Arrington, this manipulation continued through the duration of the child custody litigation. More specifically, the Debtor's conduct consisted of false accusations of sexual abuse, threats of criminal prosecution, interference with court-ordered visitation, and directing Ciara to lie about her communications with Wilson and her desires to have a parental relationship with him. Judge Arrington concluded that the Debtor did everything in her means to continue to reinforce hatred in Ciara for Wilson – including holding a party each year to commemorate the day she finally coerced Ciara to make a statement against Wilson. These facts sufficiently establish, for purposes of § 523(a)(6), that the Debtor acted with malice.

Fourth, Wilson must demonstrate that the award of attorney fees resulted from the harm. As Judge Arrington stated in his August 10, 2005 order, "If Ms. Wilson [the Debtor] had not filed undeserved sexual abuse charges against Mr. Wilson [Wilson], and if she had complied with the many visitation orders of the court, these expenses would not have been incurred." Thus, the Debtor's conduct caused Wilson to incur attorney fees he would not have otherwise had to bear.

Wilson, therefore, has satisfied all the elements necessary to except the debt owed to him by the Debtor from the Debtor's discharge pursuant to § 523(a)(6). *See Rutledge v. Rutledge (In re Rutledge)*, 105 Fed. Appx. 455, 457 (4th Cir. 2004) (holding that an award of attorney fees was excepted from discharge where the Debtor was collaterally estopped from attacking the State court finding that she had acted willfully and maliciously in falsely accusing her husband of sexually abusing their children).

The Debtor argues that Wilson is not entitled to except that part of the debt that is attributable to

12

attorney fees that he has not paid; the Debtor asserts that the attorney whom is owed the fees is the only one with standing to seek such an exception.

A debt is defined in § 101(12) as liability on a claim. A claim is defined in § 101(5)(A) as a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." The fact that Wilson has not fully paid his obligation on the attorney fees does not reduce the Debtor's obligation to reimburse Wilson for the fees. Wilson is contractually obligated to pay his attorney, and, therefore, he is indebted to him. Wilson may be subjected to collection of the debt at any time. He, therefore, has a valid claim against the Debtor for the entire amount of the attorney fees as ordered by Judge Arrington for which the Debtor is liable.

The Debtor also asserts that Wilson's motion for summary judgment cannot be granted because the amount in controversy has not been clearly established. The Debtor argues that Judge Arrington's orders awarding attorney fees do not encompass the fees incurred between August 18, 2005, and October 14, 2005.[7] The Debtor also asserts that the reasonableness of the attorney fees must be examined before she is obligated to pay them.

Wilson contends that the State court should render any determination on the meaning of its orders and the reasonableness of the attorney fees, rather than the bankruptcy court. In response to discovery requests, Wilson has provided invoices from his attorney spanning from August 2004 through May 2006, totaling $73,742.04. In the August 18, 2005 order, Judge Arrington ordered the Debtor to pay all of Wilson's attorney fees with the exception of his initial $2,500 retainer fee. In the November 29, 2005 order, Judge Arrington ordered the Debtor to pay all of Wilson's attorney fees incurred since October 14, 2005, the date the Debtor filed her Chapter 7 bankruptcy. Because the November 29, 2005 order,

---

[7] The August 18, 2005 order stated, "(The Debtor) shall pay all of (Wilson's) attorney fees, except for the $2,500 retainer paid by (Wilson) to Jeff Triplett in August of 2004, all *guardian ad litem* fees, all supervisor fees and all other court costs." In the November 29, 2005 order, which was entered after the Debtor's bankruptcy filing without prior permission of this court, Judge Arrington ordered the Debtor to pay all fees and costs incurred since October 14, 2005. Because the Debtor filed her petition on October 14, 2005, the order attempts to create a new post-petition obligation, which is not discharged in the Debtor's present bankruptcy.

13

assuming it is valid, creates a new post-petition obligation, the attorney fees owed as a result of that order are not discharged in the Debtor's present bankruptcy.[8]  As to the obligation to pay the attorney fees set forth in the August 18, 2005 order, the court has already determined that the debt is a result of the Debtor's willful and malicious conduct and is excepted from discharge pursuant to § 523(a)(6).[9]  Recognizing that the State court is in the best position to interpret the meaning of its August 18, 2005 order, the court, in concurrence with Wilson's suggestion, defers to the State court to resolve disputes arising from the reasonableness of the fees, the amount of the fees due, and the time periods covered by the August 18, 2005 order.

### 2. Carroll's Claim for *Guardian Ad Litem* Fees

Carroll asserts that she is entitled to collect $9,181.25 for her services as *guardian ad litem* to Ciara under Judge Arrington's orders because the debt owed to her is a result of the willful and malicious injury to Wilson.  Carroll contends that even though she was not the target of the Debtor's willful and malicious conduct, she was damaged by the conduct to the extent of her unpaid fees.

With respect to Carroll's argument, two analogous cases exist to support her contentions.  First, in *Western Surety Company v. Rich*, the plaintiff was a surety bondsman for the debtor, who was a sheriff.  141 F. Supp. 872, 874 (W.D. Okla. 1956).  A judgment was issued against the debtor and in favor of a third party for damages sustained from an assault and battery committed against him by the debtor.  The surety bondsman paid the damages to the third party and then sought to recover from the debtor.  The court held that the debt was excepted from discharge because the debt arose from a judgment against the debtor for willful and unlawful assault.  *Id.*  In *Rivera v. Moore-McCormack Lines, Inc.*, Moore-McCormack Lines, Inc. was sued for injuries resulting from an altercation with the debtor on its

---

[8] Because the Debtor has not brought an action to challenge the validity of the November 29, 2005 order, the court will not address it.  To the extent that any obligation is created by that order, it is not encompassed within the Debtor's Chapter 7 discharge.  The court's findings with respect to the dischargeability of this obligation shall not be construed as a determination on the validity of the order creating the obligation.

[9] Because the court finds that the Debtor's obligations to Wilson are excepted from discharge under § 523(a)(6), it is not necessary for the court to address Wilson's claims under § 523(a)(2) and (a)(15).

vessel. 238 F. Supp. 233, 235 (S.D.N.Y. 1965). Moore-McCormack Lines, Inc., in turn, sought recovery from the debtor for his failure to perform his duties in a proper and workmanlike manner. The court found that the debt owed to Moore-McCormack Lines, Inc., was excepted from discharge because it resulted from the debtor's willful and malicious conduct when he made an unprovoked attack. *Id.* The debtor attempted to distinguish his case from *Western Surety Company* since that debt arose out of a surety relationship while this debt arose from a contractual relationship. The court found no distinction, stating, "In both cases there was a debt owing based on an assault committed by the bankrupt and the creditor was not the victim of the assault." *Id.*[10]

Much like the situation in *Rivera*, the Debtor has committed a willful and malicious injury to another, and the debt owed to Carroll is a result of that conduct. Had the Debtor not filed baseless sexual abuse charges and unnecessarily prolonged the custody proceedings by refusing to comply with court ordered visitations, the *guardian ad litem* fees would not have been incurred.

The Debtor contends that she should only be obligated, at the most, to pay one-half of the fees, and only if she is deemed to have disposable income from which to make such payment. Judge Arrington, however, has ordered that the Debtor pay all of the *guardian ad litem* fees, and the Debtor cannot attack that ruling in the present proceeding. Furthermore, inability to pay an obligation does not render it discharged when it would otherwise be excepted from discharge under § 523(a)(6). 11 U.S.C. § 523(a)(6); *See, e.g., Geiger*, 523 U.S. at 61-64 (discussing the requirements for success in a § 523(a)(6) action with no discussion of the debtor's ability to repay the obligation). Therefore, the Debtor has failed to raise any issues of material fact to dispute that the debt owed to Carroll arose from her willful and malicious conduct targeted at Wilson. Because the debt owed to Carroll is a direct result of the Debtor's willful and malicious conduct, it is excepted from discharge under § 523(a)(6).[11]

### IV. CONCLUSION

---

[10] The cases cited were decided under 11 U.S.C. § 35(a)(8) prior to their recodification in 11 U.S.C. § 523(a)(6) in 1978. The 1978 revisions would not have altered the reasoning of these decisions.

[11] Because the court has found the debt excepted from discharge under § 523(a)(6), there is no reason to decide the merits of Carroll's claim under § 523(a)(2).

For the reasons set forth above, the Debtor is collaterally estopped from relitigating the factual issues that have been determined by Judge Arrington. Because no fact established by Judge Arrington can be considered in genuine dispute, and because those facts are sufficient to meet Wilson's and Carroll's burden of proof under § 523(a)(6), both Wilson and Carroll are entitled to summary judgment on their claims. Conversely, the Debtor has failed to demonstrate sufficient grounds upon which summary judgment can be granted, and thus, her motion in that regard is denied.

The court will enter separate orders pursuant to Fed. R. Bankr. P. 9021 consistent with this opinion.